Dorothy MARSHALL, Plaintiff-Appellant,

v.

James Edward BOBBITT, Defendant-Respondent,

Thomas J. Cavanaugh, Administrator of Estate of John Marshall, Deceased, Defendant-Appellant.

No. 55865.

Supreme Court of Missouri, Division No. 2.

July 17, 1972.

Padberg, Raack, McSweeney & Slater, Godfrey P. Padberg, Spitznagel & Todt, Charles P. Todt, St. Louis, for appellant.

Murphy & Kortenhof, Edward E. Murphy, Jr., St. Louis, for respondent, James Edward Bobbitt.

HOUSER, Commissioner.

Dorothy Marshall brought this action for damages for personal injuries against James Edward Bobbitt and the Administrator of the Estate of John S. Marshall, Deceased, arising out of a collision between a pickup truck in which she was riding as a passenger, driven by her husband John, and a Dodge automobile driven by Bobbitt. The cause was submitted against defendant Bobbitt under an instruction directing a verdict for plaintiff upon belief that Bobbitt either failed to keep a careful lookout or drove at an excessive speed; that Bobbitt's conduct in any one or more of these respects was negligent and that such negligence caused the collision. The jury found for plaintiff and against both defendants in the sum of $25,000. Both defendants filed motions for new trial. The court sustained Bobbitt's motion for error in submitting the case on excessive speed and ordered a new trial as to Bobbitt on the issue of liability only. The court overruled the administrator's motion and ordered that the judgment against the administrator be held in abeyance pending a new trial of plaintiff's case against Bobbitt. Both plaintiff and administrator appealed.

From the evidence favorable to the prevailing party the jury could have found the following facts: The collision occurred in the afternoon of July 11, 1967 on Highway 49 in Crawford County. It was a clear, warm day. The asphalt highway, 23 feet in width with a 5-foot shoulder on each side, ran north and south at point of collision (hereafter "PC") and was straight for several hundred feet south. Bobbitt was northbound; Marshall southbound. The scene of the accident is visible from a point 800 feet to the south, but proceeding north the highway descends into a valley and a northbound motorist cannot see it again until, ascending from the valley, he reaches a point 375 feet to the south, at which position the scene of the accident again comes into view. At a point roughly 200 feet south of PC a northbound motorist reaches a plateau and the highway is generally level for 200 feet to PC. PC was 10 feet south of an unused side road that formerly led to a now abandoned farmhouse. Debris at PC was found in the highway centered around the center line. The side road intersects the

highway at right angles and runs east from the highway. There was a tree along the side road but a vehicle moving westwardly thereon toward the highway could be seen by a motorist northbound on the highway.

Bobbitt, born and raised in that area, was familiar with the roads and with the fact that there was a "dip" in the highway and a side road as one ascends from the dip. He had driven the highway many times previously.

Marshall's pickup truck moved westwardly on the side road, emerged from the side road into the highway just prior to the collision, and at moment of impact the pickup was either on a 45° angle headed southwest, or had just reached the west (southbound) lane and straightened out in that lane.

The daytime speed limit was 65 m. p. h. Bobbitt's speed was 60–65 m. p. h. according to Bobbitt; from 65–85 m. p. h. according to other witnesses. Counting reaction time the total stopping distance at 60 m. p. h. is 306 feet; at 65 m. p. h., 352.5 feet; but with all four wheels locked by the brakes and the car skidding this is reduced to 294 feet at 60 m. p. h. and 338.5 feet at 65 m. p. h. At 75 or 80 m. p. h. the stopping distance would be a great deal longer . . . up in the 400's or 500's.

At the earliest instant at which Bobbitt could have seen the pickup truck approaching the highway the Dodge was 375 feet south of PC. Bobbitt actually saw the pickup truck for the first time when the Dodge was 160 to 170 feet south of the side road. Leon Skaggs, son-in-law of the Marshalls, had emerged from the side road in advance of the Marshalls. Skaggs, driving a camper truck, was proceeding slowly southwardly at 10 m. p. h., waiting for the pickup truck to catch up with him. Skaggs saw the oncoming Dodge coming north at a high rate of speed. Skaggs estimated the speed of the Dodge at no less than 80 m. p. h. He said the Dodge was "bouncing"—its front end raising and lowering as it approached on the highway.

Knowing that the pickup truck was entering onto the highway and sensing the danger Skaggs attempted to attract the attention of the driver of the Dodge by blinking his headlights, waving his arm out of the window and blowing his horn, but the speed of the Dodge continued unabated. The Dodge passed Skaggs' camper truck at a point 200 feet south of the side road.

Bobbitt testified that when he first saw the pickup truck it was traveling westwardly in the side road at from 10–25 m. p. h., 15 to 40 feet short of PC. It kept coming out, without stopping. There was other testimony that the pickup truck stopped 4–5 east of the edge of the asphalt pavement before pulling out onto the highway. As soon as Bobbitt saw the pickup truck he immediately swerved to the left and slammed on the brakes which locked, leaving two skid marks on the asphalt 100 feet in length, in a generally straight line parallel to the center line of the highway. These skid marks "led right up to" PC. When Bobbitt swerved and put on the brakes the back half of the pickup truck was still in the driveway and the front half was out in the highway. The pickup was moving and it continued to move until the collision occurred. The Dodge's left skid mark was laid down in the southbound lane, 1 foot 7 inches west of the center line, its right skid mark in the northbound lane, east of the center line. When brakes are applied and a vehicle goes into a skid the vehicle proceeds directly straight ahead in the direction it was going and as long as this condition continues the driver has absolutely no control over the movement of the vehicle.

Skid marks on the gravel side road, commencing 15 feet east of the east edge of the asphalt pavement, ran southwestwardly across the asphalt 19 feet to the PC.

Estimates of the speed of the Dodge at PC ranged from 45–59 m. p. h.; that of the pickup truck at from 4 to 20 m. p. h. The Dodge came to rest headed generally west by southwest, its front end near the

center of the asphalt pavement, leaving 50 feet of skid marks from PC to the place where it came to rest. The pickup truck came to rest north of PC, headed generally east, its front end slightly east of the west edge of the asphalt pavement. It left 59 feet of skid marks from PC to the place where it came to rest. The speed of the Dodge after PC was 28 m. p. h.; the speed of the pickup truck after PC was 19.6 m. p. h. Both vehicles were demolished beyond repair. The main force of the impact took effect on the left front fender and left front of each vehicle. Mr. Marshall was killed and plaintiff Dorothy Marshall was seriously injured.

### I.  On plaintiff Marshall's appeal.

The questions raised on this appeal: whether the case was properly submitted on excessive speed and/or failure to keep a careful lookout; whether there was evidence that excessive speed and/or failure to keep a careful lookout was a proximate cause of the collision, must be answered in the affirmative.

■■■ The proper test of speed as a proximate cause of a collision is whether the speed prevented the driver from avoiding the collision. Buzbee v. Greyhound Lines, Inc., Mo.Sup., 467 S.W.2d 933, and five cases cited l. c. 935. The proper test of failure to keep a careful lookout as a proximate cause is whether in the exercise of the highest degree of care the driver of the defendant's vehicle could have seen the other vehicle in time to have taken effective precautionary action in avoidance. O'Neill v. Claypool, Mo.Sup., 341 S.W.2d 129; Zalle v. Underwood, Mo.Sup., 372 S.W.2d 98. The evidence in this case, considered in the light most favorable to plaintiff, warrants a jury finding that in both respects (speed and lookout) Bobbitt was negligent. There was evidence that the driver of a northbound vehicle could have seen the top of a vehicle in the side road when the northbound vehicle was 375 feet south of the side road. Bobbitt says

that when he first saw the pickup truck he was 160–175 feet south of the side road at which time the pickup truck was back in the side road several feet, proceeding toward the highway. From his testimony it was apparent to him that the pickup truck was moving inexorably toward and would enter the highway (without stopping). Other testimony (from plaintiff and the other passenger in the pickup truck) indicates that as the pickup truck approached the highway it stopped 4 or 5 feet east of the pavement; that the driver looked to his left and said it was all clear on his side; that plaintiff looked in both directions and the other passenger looked to the right; that none of the three saw any traffic, whereupon the pickup truck moved out onto the highway. Under the latter version of the facts the jury could find that the two vehicles came into view of each other shortly after the pickup started forward from its stopped position and that Bobbitt could have seen it entering the highway at a time when the Dodge was nearly 375 feet south of the side road. The jury was not obliged to credit Bobbitt's testimony that he turned to the left (presumably causing his left wheels to leave the northbound lane, cross the center line and run in the southbound lane) when he first saw the pickup truck. The jury could find that Bobbitt was already running with his left wheels across the center line when the Dodge was 375 feet south of the side road. The jury could further find that if at the time the pickup truck first became visible to Bobbitt the latter had seen it and taken precautionary action by reducing his speed and moving back entirely within the northbound lane, the collision could have been avoided. The trouble is that Bobbitt did not see the pickup truck until he was 160–175 feet south of the side road, as he himself admitted, and that at the high speed he was traveling he was prevented from taking effective preventive measures. Bobbitt argues that he acted as soon as he saw the pickup truck; he concedes (and asks for exoneration on the basis that) once he applied the brakes and

commenced to skid he lost all control of the Dodge and there was nothing further he could do to avoid the collision. As pointed out by appellant, even under Bobbitt's version of the facts, the latter had 100 feet after reaction time within which to slacken the brake pressure, regain control and move back into the northbound lane, and the jury could have found that if his speed had not been excessive he could have done so, but due to his tardy lookout and "excessive speed, he hit his brakes, went into a skid and became a deadly instrumentality." Under the favorable evidence, if Bobbitt had maintained a careful lookout ahead and laterally as required in the exercise of the highest degree of care he could have seen the pickup truck, sensed the danger and taken preventive measures at a point 200 feet south of the point where Bobbitt says he first saw the pickup truck. Had he done so and had he been traveling at a reasonable speed it could reasonably be found that he could have applied the brakes sooner than he did, thereby giving the driver of the pickup truck more time to escape the path of the Dodge or turn the pickup truck to his right so the vehicles would miss each other, and Bobbitt would have had more time to steer to the right in avoidance or, having locked the brakes and gone into the lock-in collision course, more time within which to release the brakes, regain control and bring the Dodge entirely back into the northbound lane. Under all the circumstances of this case, including the fact that Bobbitt was thoroughly familiar with the area and the side road, and is held in the exercise of the highest degree of care to anticipate the possibility of vehicles suddenly emerging from side roads; that he had the duty of maintaining sufficient lookout and control over his vehicle as to be able to avert an accident in such a contingency; that he was not entitled to wait until the moment of actual peril before beginning to reduce speed; having in mind the estimates of high speed at which the Dodge was traveling; the considerable distance and time available to him to take preventive action after the pickup truck first became visible to Bobbitt; Bobbitt's failure to see the pickup truck at the earliest possible moment—that he could have seen it when the Dodge was 200 feet farther south than it was when he did finally see it; the length of skid marks laid down by the Dodge prior to PC; Bobbitt's failure to swerve to the right back into his own lane; the fact that Bobbitt locked his brakes when the Dodge was in a fixed course with its left wheels west of the center line; the absence of evidence that Bobbitt released his brakes prior to PC in an attempt to swerve the Dodge to the right in avoidance; the speed of the Dodge at PC; the violence of the impact; the speeds of both vehicles as they continued north after the momentum-absorbing impact; and the length of the skid marks of both vehicles from PC to where they came to rest, we are firmly of the opinion that the evidence was sufficient to support an inference of failure to keep a careful lookout, and excessive speed, and to authorize submission of lookout failure and excessive speed as causative factors. Buzbee v. Greyhound Lines, Inc., supra; Hamilton v. Slover, Mo.Sup., 440 S.W.2d 947, 956[11]; Baumle v. Smith, Mo.Sup., 420 S.W.2d 341, 345[4]; Wolfe v. Harms, Mo.Sup., 413 S.W.2d 204, 210[2–7]; Burks v. Leap, Mo.Sup., 413 S.W.2d 258, 263[3]; Calvert v. Super Propane Corporation, Mo.Sup., 400 S.W.2d 133, 139[5–7]; Bramblett v. Harlow, Mo.App., 75 S.W.2d 626, 630[7–9].

II. On the Administrator's appeal.

■ Invoking the exclusionary rule laid down in Housman v. Fiddyment, Mo.Sup. en Banc, 421 S.W.2d 284, the administrator claims error in the admission over his objection of the opinion testimony of Highway Patrol Trooper Keck that the skid marks leading out of the side road were laid down by the Marshall pickup truck. Assuming that this testimony was inadmissible under Housman v. Fiddyment and that its admission in evidence over proper and timely objections would have

been error, the administrator is in no position to complain for the reason that testimony of the same tenor had been received without objection. On the direct examination of Trooper Keck, without any objection by counsel for the administrator, Keck testified extensively about tire marks, location of debris, location and direction of skid marks made by the Bobbitt automobile leading up to the point of impact and by both vehicles following impact, using in connection with his testimony a blackboard copy of the chart he prepared in the course of his investigation. That copy of the chart, prepared for exhibition to the jury, showed skid marks made by both vehicles both before and after impact, probable point of impact, and skid marks made by the Marshall pickup truck, 15 feet in length on the gravel side road and 19 feet in length on the highway. Among other things counsel for defendant Bobbitt then elicited from the trooper that he found other tire marks laid down at the scene, coming out of the side road onto the highway, 15 feet on the gravel road and 19 feet on the paved portion of the highway, to the point of impact where the debris was centered, and that the witness had marked these skid marks down on the official plat he prepared as having been made by the pickup truck. Counsel for the administrator made no objection to these several references to the skid marks notwithstanding they were directly connected with the Marshall pickup truck on the plat, which was in plain view of the jury. Having failed to object to this evidence when it first entered the case the administrator waived the right to have it excluded. Sullivan v. Union Electric Light & Power Co., 331 Mo. 1065, 56 S.W.2d 97, 104[17], and numerous other cases cited in State ex rel. State Highway Commission v. Warner, Mo.App., 361 S.W.2d 159, 164, fn. 3. This is the only point made by the administrator on this appeal. The court did not err in overruling the administrator's motion for a new trial.

Accordingly, the order sustaining defendant Bobbitt's motion for a new trial is reversed; the order overruling the administrator's motion for new trial is affirmed; and the cause is remanded with directions to reinstate the verdict of the jury and enter final judgment for plaintiff and against both defendants for $25,000.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

MORGAN, P. J., HENLEY and DONNELLY, JJ., and LEWIS, Special Judge, concur.